UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

JESUS LOZOYA,

    Petitioner,

v.                                 Case No. 8:19-cv-520-KKM-AEP

SECRETARY, DEPARTMENT

OF CORRECTIONS,

    Respondent.

_____

## ORDER

Jesus Lozoya, a Florida prisoner, timely[1] filed a pro se amended Petition for Writ

of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 5.) Having considered the petition (*id.*),

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Lozoya's convictions and sentences were affirmed on August 12, 2011. Lozoya's judgment became final 90 days later, on November 10, 2011, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). Before the judgment became final, Lozoya filed a petition alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141(d) and provided it to prison officials for mailing on August 30, 2011. The state appellate court apparently did not receive the petition until Lozoya contacted the court in 2018. Because the petition was deemed filed on August 30, 2011, *see Houston v. Lack*, 487 U.S. 266, 276 (1988), it remained pending until the state appellate court denied it on May 14, 2018. Lozoya filed his amended § 2254 petition less than one year later, on March 22, 2019. The amended § 2254 petition is therefore timely.

the response in opposition (Doc. 12), and Lozoya's reply (Doc. 25), the Court orders that the petition is denied. Furthermore, a certificate of appealability is not warranted.

## I.      BACKGROUND
### A. Procedural Background

The State of Florida charged Lozoya and co-defendants Miguel Quijada and Epifanio Muniz with one count of kidnapping with intent to inflict bodily harm or terrorize and charged Lozoya and Muniz with one count of aggravated battery and Quijada  with simple battery. (Doc. 15-1, Ex. 5.) Lozoya rejected an offer from the State for a prison sentence of five-and-a-half years in exchange for pleading guilty as charged. (*Id.*, Ex. 6.)

A state jury convicted Lozoya of kidnapping with intent to inflict bodily harm or terrorize, as charged, and of the lesser-included offense of battery. (*Id.*, Ex. 7.) The state trial court sentenced him to an overall term of 25 years in prison. (*Id.*, Ex. 8.) The state appellate court per curiam affirmed the judgment and sentence. (*Id.*, Ex. 13.) Lozoya filed a counseled motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 15-2, Ex. 15.) The state court denied the motion after an evidentiary hearing. (Docs. 15-3, 15-4, & 15-5, Ex. 20.) The state appellate court per curiam affirmed the denial of relief. (Doc. 15-6, Ex. 26.)

## B. Factual Background and Trial Testimony[2]

Enrique Narvaez was walking near his residence on the evening of August 7, 2009, when Miguel Quijada and Epifanio Muniz approached him, accused him of stealing some rims, and began to hit him. (Doc. 15-8, Ex. 32, pp. 83-84, 86.) Narvaez ran, but his path was cut off by a Hummer driven by Lozoya. (*Id.*, p. 85.) When Lozoya exited the Hummer, Narvaez recognized Lozoya as they had known each other for about a year and half. (*Id.*) Lozoya, Quijada, and Muniz all hit Narvaez, and Lozoya used an object Narvaez referred to as a "stick" or a 2x4. (*Id.*, pp. 86-87.) Lozoya appeared to be in charge and told the others to hit Narvaez. (*Id.*, p. 87.) When Narvaez fell down, all three perpetrators picked him up and forced him inside the Hummer. (*Id.*, pp. 103-04.) Muniz tied Narvaez's hands behind his back with a cable. (*Id.*, p. 87.) All three men continued to hit Narvaez. (*Id.*, pp. 87, 105.) His legs were burned with a lighter. (*Id.*, p. 88.)

Lozoya drove the Hummer to the residence of Mateo Hernandez, whom Narvaez also knew. (*Id.*, pp. 88, 102.) Narvaez denied voluntarily getting into the Hummer to go see Hernandez. (*Id.*, p. 105.) When they arrived, Hernandez got inside the Hummer and also hit Lozoya. (*Id.*, p. 88.) Hernandez and Lozoya said that they were going to kill Narvaez and throw him in a lake. (*Id.*, p. 89.) Lozoya, Quijada, and Muniz left Narvaez at Hernandez's house. (*Id.*) Hernandez accused Narvaez of wanting to steal from him and

---

[2] The factual background is derived from the trial transcript unless otherwise noted.

3

said that he would kill Narvaez. (*Id.*, pp. 110-11.) Narvaez heard Hernandez tell his niece that he had paid $2,000 for Narvaez to be brought to his home. (*Id.*, p. 113.)

At about 4:00 a.m., police arrived (apparently following a tip from Hernandez's niece) and took Narvaez to a hospital. (*Id.*, pp. 89, 111-13, 115.) Officer Michael Bard responded to the hospital and documented Narvaez's injuries, which included multiple bruises, marks on his forehead and face, cuts and scrapes on his back and sides, and cuts and burn marks on his feet. (*Id.*, pp. 139-41.) Narvaez testified at trial that he still had scars from the burns inflicted on him, and he showed the jury a scar on his leg. (*Id.*, pp. 90-91.)

Two eyewitnesses testified to the incident. Sean Rossi observed two people running into the development where he lived and heard the person in front screaming for help. (*Id.*, p. 119.) Rossi saw an orange Hummer pull up. (*Id.*, pp. 119, 122.) After the driver got out, Rossi observed two people, including the driver, beat the victim. (*Id.*, pp. 120, 122, 125-26.) The people "threw" the victim into the Hummer and drove off. (*Id.*, p. 120.)

Mark Pfister, an off-duty detective, was outside on his friend's third-floor balcony when he saw what looked like people running and being chased by a vehicle. (*Id.*, pp. 129-130.) He observed one person running, followed by two others on foot, and observed the Hummer overtake the person in the front. (*Id.*, p. 130.) Pfister went inside to get his phone and when he came back to the balcony, he saw a person on the ground in front of the

Hummer and could tell that someone had gotten out of the car. (*Id.*, p. 131.) He heard yelling and sounds like a person being beaten. (*Id.*) Due to his positioning and his distance of approximately 300-350 yards, Pfister could not see all the activity, but he called 911. (*Id.*, pp. 131-32.)

Co-defendant Miguel Quijada testified at trial and admitted his involvement in the offenses. Quijada testified that Lozoya directed him, along with Muniz, to get out of the vehicle and talk to Narvaez, and that when Narvaez saw them he began running. (*Id.*, p. 162.) Quijada testified to Lozoya driving around and cutting off Narvaez's path. (*Id.*) Quijada became tired and started walking; when he reached the others, he began hitting Narvaez. (*Id.*) Quijada heard Muniz say that he knew Narvaez had stolen rims. (*Id.*, pp. 162-63.) Quijada saw Lozoya pick something up off the ground and hit Narvaez with it, causing Narvaez to fall. (*Id.*, p. 163.) Lozoya opened the vehicle's door; Quijada and Muniz complied with Lozoya's direction to put Narvaez inside. (*Id.*, pp. 163-64, 173-74.) Muniz tied Narvaez's hands with a wire. (*Id.*, p. 164.) Quijada testified that he did not beat Narvaez in the car on the drive to Mateo Hernandez's house. (*Id.*, p. 166.)

At Hernandez's house, Quijada saw Hernandez strike Narvaez. (*Id.*, p. 168.) Quijada testified that Hernandez had been robbed and believed that Narvaez was involved in or knew about the robbery. (*Id.*, pp. 167-69.) Narvaez repeatedly said that he did not know what they were talking about. (*Id.*, p. 169.) Quijada heard Hernandez say that he

had paid for Narvaez to be brought to his house and that he could pay for someone to kill Narvaez if he did not disclose information about the robbery. (*Id.*, pp. 169-70.)[3]

Detective Robert McLellan investigated an orange Hummer. The Hummer's owner met with Detective McLellan at the police station. (*Id.*, p. 145.) The owner stated that he was not using the vehicle, that he had parked it at Lozoya's residence, and that Lozoya was making payments on it. (*Id.*, pp. 145-47.) Lozoya—who had not been developed as a suspect at the time—accompanied the vehicle's owner to the police station and told Detective McLellan that he left the Hummer with two men in Lakeland but did not provide any identifying information about these individuals. (*Id.*) Narvaez identified the involved vehicle at a police-impound lot. (*Id.*, p. 93.) Narvaez identified Lozoya, Quijada, and Muniz when Detective McLellan showed him three photopacks. (*Id.*, p. 91-93.) Narvaez identified each man's photograph "almost immediately" and expressed that he was 100 percent positive of his identification of all three. (*Id.*, pp. 148-52.)

## II.   STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the

---

[3] Neither Mateo Hernandez nor Lozoya's co-defendant Epifanio Muniz testified at trial. The prosecutor told the state trial court at sentencing that Muniz had been apprehended in Texas and extradited to Florida and was awaiting trial. (Doc. 15-8, Ex. 33, p. 9.) The record does not disclose whether Hernandez faced charges in connection with these events or, if so, how the charges were resolved.

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d)

provides that federal habeas relief cannot be granted on a claim adjudicated on the merits

in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), a decision is "contrary to" clearly established federal

law "if the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the Supreme]

Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362,

413 (2000). The phrase "clearly established Federal law" encompasses the holdings only of

the Supreme Court of the United States "as of the time of the relevant state-court decision."

*Id.* at 412. A decision involves an "unreasonable application" of clearly established federal

law "if the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

*Id.*

For purposes of § 2254(d)(2), a state court's findings of fact are presumed correct.

*See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the

state court, including the credibility findings, are presumed to be correct . . . .”). A petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The AEDPA was meant “to prevent federal habeas ‘retrials’ and to ensure that state-court convictions are given effect to the extent possible under law.” *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, “[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one.” *Id.* at 694. As a result, to obtain relief under the AEDPA, “a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that “[t]he state court's application of clearly established federal law must be objectively unreasonable” for a federal habeas petitioner to prevail and that the state court's “clear error” is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the

decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* The state may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that

some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III. <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Lozoya brings several claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

10

conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   <u>ANALYSIS</u>

### A. Ground Four

Lozoya contends that trial counsel was ineffective for failing to sufficiently cross-examine Narvaez. Lozoya argues that counsel should have cross-examined Narvaez about his participation in a pre-trial intervention (PTI) program for a grand theft charge[4] as well as Narvaez's alleged extortion of Lozoya's family. Lozoya asserts that an adequate cross-examination would have damaged Narvaez's credibility and showed his interest in testifying for the State to assist him in his PTI participation. The state postconviction court granted an evidentiary hearing on Lozoya's claim.

Lozoya's family initially retained attorney Gabriela Munoz to represent him in the criminal proceeding. (Doc. 15-9, Ex. 34, Vol. 1, p. 31.) Lozoya's sister Louisa Lozoya had hired Munoz for past matters and therefore had a relationship with Munoz. (*Id.*; Doc. 15-10, Ex. 34, Vol. 2, pp. 50-51.) Louisa served as the family's primary contact with Munoz. (Doc. 15-9, Ex. 34, Vol. 1, pp. 36-37; Doc. 15-10, Ex. 34, Vol. 2, pp. 51, 53.) As trial approached, the Lozoya family and Munoz decided to hire another attorney to try the case. (Doc. 15-9, Ex. 34, Vol. 1, p. 34; Doc. 15-10, Ex. 34, Vol. 2, p. 64.) At Munoz's recommendation, the family hired attorney Jack Crooks. (Doc. 15-10, Ex. 34, Vol. 2, p.

---

[4] A pretrial intervention program may be available for eligible persons charged with a crime and "shall provide appropriate counseling, education, supervision, and medical and psychological treatment as available and when appropriate for the persons released to such programs." § 948.08(1), (2), Fla. Stat. "In the PTI program, the defendant agrees to abide by the terms and conditions of the [agreement]. Upon successful completion of the program, the court dismisses the charges." *Walker v. Lamberti*, 29 So.3d 1172, 1173 (Fla. 4th DCA 2010). "The prosecution of a defendant on pretrial release for PTI who does not fulfill his or her obligations may continue at the discretion of the prosecuting authority." *Harris v. Ryan*, 147 So.3d 1100, 1102 (Fla. 3d DCA 2014).

64.) Munoz stated that she withdrew from representation when Crooks appeared in the case but that she remained involved as a courtesy to the Lozoya family to help Crooks and to facilitate communication since she knew the family and spoke Spanish, as did Lozoya and his family. (*Id.*, pp. 59-60, 62-63, 71, 78, 85.) Lozoya's family did not have direct interaction with Crooks, and Crooks spoke to Lozoya through Munoz because she spoke Spanish. (Doc. 15-9, Ex. 34, Vol. 1, p. 37; Doc 15-10, Ex. 34, Vol. 2, pp. 50-51; Doc. 15-11, Ex. 35, pp. 3, 10, 13-14.) The state postconviction court noted in its order that the record contained no motion to withdraw or motion to substitute counsel, and the court concluded that it was "clear that [Munoz] continued to act as counsel in some capacity . . . even though Mr. Crooks was trying the case. (Doc. 15-3, Ex. 20, p. 14.)

### 1. Failure to Cross-Examine Narvaez About PTI

Munoz testified that she was aware Narvaez had entered the PTI program and that he was in compliance with its terms. (Doc. 15-10, Ex. 34, Vol. 2, pp. 55, 66.) Munoz testified that Narvaez had been on PTI prior to her being retained and that it was not a situation in which Narvaez "had a pending case where they were extending an offer of PTI. He was already in PTI, in compliance." (*Id.*, p. 70.) Therefore, Munoz had no reason to believe that Narvaez was offered PTI in exchange for truthful testimony. (*Id.*)

Munoz testified that Narvaez had appeared for a deposition and stated his intent to proceed with the charges. (*Id.*, pp. 54-57.) Munoz communicated this information to the

Lozoya family because they thought Narvaez was not interested in pursuing the charges and might not appear for trial. (*Id.*) Munoz testified that she did not discuss legal strategy with Crooks, who conducted Narvaez's cross-examination. (*Id.*, p. 80.)

Crooks testified that he could not recall whether he knew that Narvaez was in a PTI program. (Doc. 15-11, Ex. 35, pp. 4-5.) Crooks testified that if he had known, he still would not have questioned Narvaez about his PTI status as a strategic matter, even though he agreed that it was possible such questioning could have impeached Narvaez's credibility. (*Id.*, pp. 5, 19-20.)[5] Crooks testified that he wanted to avoid giving the jury the impression that the defense believed "well, gee, [Narvaez is] on PTI so everything [Lozoya] did is okay." (*Id.*, pp. 21-22.)

The postconviction court denied Lozoya's ineffective assistance claim. The court declined to address whether counsel performed deficiently in not cross-examining Narvaez

---

[5] The Florida Supreme Court addressed the cross-examination of a witness who had been charged with a crime and was on PTI:

> "When charges are pending against a prosecution witness at the time he [or she] testifies, the defense is entitled to bring this fact to the jury's attention to show bias, motive, or self-interest." *Torres-Arboledo v. State*, 524 So.2d 403, 408 (Fla.), *cert. denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). However, evidence of bias is subject to a section 90.403, Florida Statutes (1993), balancing and may be inadmissible if its unfair prejudice to a witness or a party substantially outweighs its probative value. Charles W. Ehrhardt, *Florida Evidence* § 608.5 (1996 ed.). How far the inquiry can proceed into the details of the matter is within the court's discretion. *See Dufour v. State*, 495 So.2d 154, 159-60 (Fla. 1986) (finding that court did not abuse its discretion by limiting inquiry into details of pending criminal charges after witness had been examined about fact of charge), *cert. denied*, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987).

*Coolen v. State*, 696 So.2d 738, 743 (Fla. 1997) (footnote omitted).

about his PTI participation. (Doc. 15-3, Ex. 20, p. 8.) The court instead ruled that, "even without addressing counsel's performance, Defendant has failed to demonstrate prejudice." (*Id.*) The court stated that Narvaez "testified that these offenses occurred, and identified Defendant as the leader of and as one of the men who committed the offenses." (*Id.*) The court noted that Narvaez's testimony was corroborated by the two independent eyewitnesses, as well as by Quijada, and that evidence connected Lozoya to the orange Hummer. (*Id.*) The court also pointed out that Narvaez's injuries were observed by police and that photographs of his injuries were entered into evidence. (*Id.*)

The court found that "[i]n light of the strength of the testimony and evidence adduced at trial, . . . there is not a reasonable probability that the outcome of the proceedings would have been different but for counsel's failure to cross-examine Mr. Narvaez about his participation in PTI for the offense of grand theft." (*Id.*)

Lozoya does not show that the state court unreasonably rejected his claim on *Strickland*'s prejudice prong. As the state court addressed, the prosecution presented other evidence that supported the version of events to which Narvaez testified. Lozoya does not show that cross-examining Narvaez about the fact that he entered the PTI program would have so damaged his credibility that there is a reasonable probability the outcome of trial would have been different. Thus, Lozoya does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying this claim.

### 2. Failure to Cross-Examine Narvaez About Extortion

Four members of the Lozoya family—Lozoya's mother, Louisa Lozoya Sr., sisters Louisa and Celene Lozoya, and brother Francisco Lozoya—testified to Narvaez's alleged extortion of their family. Lozoya's mother testified that, about six months before trial, Narvaez demanded $3,000 to testify regarding the "bunch of lies" he told police. (Doc. 15-9, Ex. 34, Vol. 1, p. 6.)[6] Lozoya's mother did not have the money available, and on several occasions, she gave him sums of $100 or $200. (*Id.*, pp. 6-8.) The day before trial, she testified, Narvaez came to her house and demanded the balance of $2,500. (*Id.*, p. 8.) He told her that if she did not pay him, he would make certain Lozoya spent the rest of his life in prison. (*Id.*) After Lozoya's mother obtained the money from Francisco that day and paid it to Narvaez, Narvaez stated that he was going to come to court and tell the truth. (*Id.*, p. 9.)

Celene testified that she observed several of the earlier interactions between Narvaez and her mother, and that Narvaez said he wanted money to tell the truth in court and admit that there was no kidnapping. (*Id.*, pp. 15-16, 18.) Francisco testified to providing $2,500 to his mother the day before the trial and to hearing Narvaez say he would tell the truth at trial and Lozoya would be released. (*Id.*, pp. 23-24.)

---

[6] Lozoya asserts in his § 2254 petition that Narvaez also sought a vehicle from his family. (Doc. 5, p. 15.) The evidentiary hearing testimony does not reveal that Narvaez demanded a vehicle.

Louisa testified that she went to see her mother the day before trial when Narvaez arrived and said he needed the money to tell the truth. (*Id.*, pp. 32-33.) Her mother told her about Narvaez's earlier demands. (*Id.*, p. 38.) Louisa testified that, on the morning of trial, after the jury had been selected, she told Munoz what had happened while they were in a hallway outside the courtroom. (*Id.*, pp. 38-39, 47.) Louisa testified that Munoz said she would take care of it. (*Id.*, p. 39.)

Louisa also testified that she first learned about an exchange of money with Narvaez the day before trial. (*Id.*, p. 43.) The family did not contact police, and aside from Louisa's discussion with Munoz, none of the family members attempted to inform Lozoya's attorneys about the extortion allegations. (*Id.*, pp. 9, 11, 17-18, 20-21, 25, 45; Doc. 15-10, Ex. 34, Vol. 2, pp. 46-47.)

Munoz testified that Louisa[7] told her about the payment on the morning of trial. (Doc. 15-10, Ex. 34, Vol. 2, pp. 72-74.) Munoz testified that the only information she recalled about "money changing hands" involved the meeting between Narvaez and Lozoya's family the day before trial. (*Id.*, pp. 59, 73-74.) She testified that Crooks was present when Louisa told her about the exchange of money but agreed that she was not certain whether Crooks heard the information. (*Id.*, pp. 65, 74-75, 79.)

---

[7] Munoz recalled having some communication with Lozoya's girlfriend and indicated that on the day of trial Lozoya's girlfriend might have mentioned the demand for money. (Doc. 15-10, Ex. 34, Vol. 2, pp. 53, 56.) Lozoya's girlfriend was not identified and did not testify at the state court evidentiary hearing.

Munoz testified to earlier contact between Narvaez and the Lozoya family. Munoz testified that she believed this situation was "not one-sided" and that family members told her they had given Narvaez money and "some things" and he asked for more. (*Id.*, pp. 66-67.) Munoz explained that, while money had initially gone from the family to Narvaez "at the beginning of the case," she believed the situation "flipped" and Narvaez later asked for money in exchange for not appearing in court. (*Id.*, p. 67.) She told the family that their interactions with Narvaez were risky because they could be viewed as witness tampering and as adverse to Lozoya's defense. (*Id.*, p. 57.) She did not think it was in Lozoya's best interest to raise any earlier exchange because, based on what she knew "during [her] representation . . . it would have made [Lozoya] seem like he was the one committing the crime." (*Id.* pp 82, 87.) Munoz was concerned that this information "not only could expose [Lozoya] to worse consequences, it would make him look much worse in front of a jury." (*Id.*, p. 90.) Munoz testified that she relayed to Crooks all information she knew about the case, including any earlier exchange. (*Id.*, p. 64.)

Crooks testified that he had no recollection of any discussion about an exchange of money. (Doc. 15-11, Ex. 35, pp. 8, 10, 14, 26.) Crooks recalled that Lozoya felt fairly certain that Narvaez was not going to appear at trial, but Crooks did not know why Lozoya thought so. (*Id.*, p. 9.) Crooks testified that unless he had clear evidence of extortion, he would be "hesitant to go into that area" because it could have exposed Lozoya to a charge

of tampering with a witness "if it came out that way" and that "unless there's some evidence that makes it clear which way it's going, I wouldn't have raised it in trial[.]" (*Id.*, pp. 9, 16.) Similarly, Crooks testified that if there was any evidence that Lozoya's family had offered the victim money not to appear, he would have chosen not to "go there" because "you don't know what can of worms you're going to open." (*Id.*, pp. 24-25.)

Crooks agreed that he would have pursued the matter and raised it on cross-examination to attack Narvaez's credibility if he had clear evidence that Narvaez extorted the Lozoya family. (*Id.*, pp. 11-12, 14-15, 17-18.) But Crooks testified that he did not know there were potential witnesses who could testify to alleged extortion. (*Id.*, p. 18.)

The state postconviction court rejected Lozoya's claim that trial counsel was ineffective for not cross-examining Narvaez about his alleged extortion of Lozoya's family. The court found that Lozoya did not demonstrate that Crooks performed deficiently. The court ruled that, based on the evidentiary hearing testimony, Lozoya "failed to sufficiently demonstrate that Mr. Crooks was even aware of what transpired the night before trial and the witnesses to that exchange." (Doc. 15-3, Ex. 20, p. 14.)[8] Therefore, the court concluded, Lozoya "has failed to demonstrate that Mr. Crooks performed deficiently in failing to cross-examine Mr. Narvaez on this extortion issue." (*Id.*)

_____

[8] To the extent the state court's decision rested on its determination that the evidentiary hearing testimony of Crooks, Louisa, and Munoz were credible, that determination is a factual finding that is presumed correct. *See Rolling*, 438 F.3d at 1301. Lozoya does not rebut the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The court declined to determine whether Munoz "was still counsel of record or should have advised or discussed with Mr. Crooks what Louisa told her about the exchange of money the night before trial or otherwise performed deficiently[.]" (*Id.*) However, the court found that Lozoya did not demonstrate prejudice resulting from the failure to cross-examine Narvaez about the alleged extortion. In explaining its prejudice analysis, the court again cited the evidence of guilt presented against Lozoya, such as testimony of the two eyewitnesses and Quijada, which supported Narvaez's testimony, as well as evidence of Narvaez's injuries and Lozoya's connection to the orange Hummer. (*Id.*, pp. 14-15.) The court concluded that "[i]n light of the testimony and evidence adduced at trial, the Court finds there is not a reasonable probability that the result of the proceedings would have been different had counsel cross-examined Mr. Narvaez on his purported extortion of the Lozoya family." (*Id.*, p. 15.)

Lozoya has not shown that the state court's rejection of his claim was unreasonable. First, he does not demonstrate that the state court unreasonably determined that Crooks did not perform deficiently given the lack of evidence that Crooks knew of the alleged extortion. This Court also notes what Crooks himself observed—cross-examination on this topic exposed his client to worse implications in front of the jury, potentially causing more harm than benefit. In that respect, a sound strategic decision to avoid accusations of witness tampering can hardly be deemed deficient performance. Nor does Lozoya show that the

state court unreasonably applied *Strickland*'s prejudice prong. As the state court pointed out, the other witnesses' testimony was consistent with Narvaez's testimony about the offenses. Thus, even if Narvaez had been discredited by cross-examination about the extortion allegations, other independent evidence supported the State's theory of guilt. Lozoya does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his ineffective assistance claims. He is not entitled to relief on Ground Four.

### B. Grounds One, Two, and Three
#### 1. Introduction

Lozoya's remaining grounds allege that trial counsel was ineffective for not properly advising him when he was considering the State's plea offer for five-and-a-half years in prison. He contends that, if not for counsel's inadequate advice, he would have accepted the offer. Lozoya concedes that these claims are not exhausted because he did not raise them in his counseled state court postconviction motion. Because Lozoya cannot return to state court to raise the claims in an untimely postconviction motion, *see* Fla. R. Crim. P. 3.850(b), they are procedurally defaulted. *See Smith*, 256 F.3d at 1138. Lozoya does not argue or establish that the fundamental miscarriage of justice exception applies to overcome the default. *See id.*

But Lozoya does contend that the cause and prejudice exception applies under *Martinez v. Ryan*, 566 U.S. 1 (2012). In recognizing a narrow exception to the rule that

ineffective assistance of postconviction counsel does not constitute cause to overcome a procedural default, *Martinez* holds:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17.

To establish cause under *Martinez*, a petitioner must demonstrate that the defaulted ineffective assistance of trial counsel claim "is a substantial one, which is to say that [he] must demonstrate that the claim has some merit." *Id.* at 14. A claim that does not have any merit or that is wholly without factual support is not substantial. *See id.* at 15-16. A petitioner shows that his defaulted claim is substantial under *Martinez* by demonstrating that "reasonable jurists 'would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" *Clark v. Comm'r, Ala. Dep't of Corr.*, 988 F.3d 1326, 1331 (11th Cir. 2021) (quoting *Hittson v. GDCP Warden*, 759 F.3d 1210, 1269-70 (11th Cir. 2014)). Thus, when a petitioner had counsel in his initial-review postconviction proceeding, he may establish cause for the default of an ineffective assistance of trial counsel claim by showing both that his postconviction counsel was ineffective under *Strickland* for

not raising the claim and that the claim is substantial under *Martinez. See Duffy v. Sec'y, Dep't of Corr.*, 729 F. App'x 669, 670 (11th Cir. 2018).

The Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). When a petitioner alleges that counsel's deficient performance led to the rejection of a plea offer, he must make certain showings to demonstrate resulting prejudice. The petitioner must demonstrate that if not for counsel's deficient performance, there is a reasonable probability that (1) he would have accepted the plea offer and the State would not have withdrawn the offer; (2) the court would have accepted the plea; and (3) the conviction or sentence, or both, under the terms of the plea offer would have been less severe than that which was imposed. *Id.* at 163-64.

### 2. Ground One

Lozoya contends that trial counsel was ineffective for failing to tell him that Narvaez extorted his family. Lozoya contends that he was "confident that Narvaez would tell the truth that Lozoya did not kidnap, put in fear, or torture him, and that they had been friends for several years. Instead, because Lozoya's [sic] never caved to the extortion, Narvaez lied on the stand to the shock and dismay of Petitioner." (Doc. 5, p. 7.) Lozoya appears to claim

that, if he knew of the extortion (and thus realized that there was a possibility Narvaez would not testify as Lozoya expected), he would have accepted the plea offer.[9]

Lozoya does not demonstrate that postconviction counsel was ineffective for not raising this claim. As an initial matter, Lozoya fails to establish that postconviction counsel was aware of this potential ineffective assistance of trial counsel claim. Lozoya's argument does not involve a question of law apparent from the face of the record. Rather, it concerns Lozoya's decision-making process and whether certain information would have affected his choice to reject the plea offer. Lozoya does not demonstrate that he conveyed the claim, including his reason for rejecting the State's offer, to postconviction counsel.

Lozoya contends that he is not proficient in English and that his brother Francisco communicated with postconviction counsel. Lozoya attaches Francisco's affidavit, which states that Francisco told postconviction counsel that it was trial counsel's fault that Lozoya did not take the plea because trial counsel did not tell him about Narvaez's demand for money to tell the truth. (Doc. 5-3.) Francisco's "affidavit" is unsworn and he states only that the information contained in it is "true to the best of my recollection." (*Id.*) Notably absent is a statement that, under penalty of perjury, the representations are true and correct. *See* 28 U.S.C. § 1746(2); *Delano v. Mastec, Inc.*, No. 8:10-cv-320, 2011 WL 1557863, at

---

[9] As in Ground Four, Lozoya contends that Narvaez demanded money as well as a vehicle from his family. (Doc. 5, p. 6.) However, Lozoya's family members' testimony concerned the demands for money. Lozoya does not establish that the alleged extortion involved a vehicle.

*1 (M.D. Fla. Apr. 25, 2011) (Whittemore, J.) ("Mere submission of a document calling itself an *affidavit* does not make it an affidavit." (quotation marks omitted)). The Court concludes that this affidavit—more properly deemed an unsworn declaration—is insufficient to establish that postconviction counsel was made aware of this potential ineffective assistance of counsel claim concerning Lozoya's decision-making at the time the State presented the offer. *See, e.g., Newson v. Sec'y, Dep't of Corr.*, 797 F. App'x 488, 495 (11th Cir. 2019) (concluding that a habeas petitioner's "unsworn and unverified allegations" about a prospective witness were "insufficient" to show that the prospective witness would have been willing to testify at trial and would have testified as the petitioner claimed); *Karcher v. Wainwright*, 476 F.2d 179, 180 (5th Cir. 1973) (explaining that a court need not consider "unverified factual allegations" offered in support of a habeas petition).

Nor does Lozoya establish that his ineffective assistance of trial counsel claim is substantial under *Martinez*. The record supports the conclusion that Lozoya simply was not willing to accept a plea deal. Counsel stated at the sentencing hearing that Lozoya did not accept the offer because he could not come to terms with going to prison. (Doc. 15-8, Ex. 33, pp. 3-4.) Lozoya did not contest counsel's representation. When Lozoya addressed the state trial court at sentencing, he asked, despite having been convicted of a first-degree

felony punishable by life in prison, *see* § 787.01(1)(a)3., (2), Fla. Stat., if there was "any way that I can get some kind of house arrest or some kind of long probation?" (*Id.*, p. 8.)

Lozoya's comment supports counsel's representation that Lozoya could not grasp going to prison and undercuts his assertion that he would have accepted a deal to serve five and a half years in prison had he known of information potentially affecting Narvaez's testimony. *See, e.g.*, *Duffy*, 729 F. App'x at 670 (finding that the petitioner failed to establish that postconviction counsel was ineffective for not arguing that trial counsel inadequately advised him about a plea offer when the petitioner "offer[ed] nothing indicating—much less showing a reasonable probability—that he had any intent to plead guilty"). And Lozoya rejected the offer despite knowing that the State intended to proceed to trial, as stated in the written rejection of the plea offer. (Doc. 15-1, Ex. 6.)

Even if the ineffective assistance of trial counsel claim was raised, the evidentiary hearing testimony likely would have defeated it. As addressed, Crooks testified that he had no recollection of any information about extortion. (Doc. 15-11, Ex. 35, pp. 8, 10, 14, 26.) Louisa's and Munoz's testimony reflects that Louisa informed Munoz of the alleged extortion the on the day of trial. (Doc. 15-9, Ex. 34, Vol. 1, p. 38, 39, 43; Doc. 15-10, Ex. 34, Vol. 2, pp. 59, 73-74.) And Louisa testified that she first became aware of the exchange of money the day before trial. (Doc. 15-9, Ex. 34, Vol. 1, p. 43.) Trial commenced on

August 2, 2010. (Doc. 15-7, Ex. 31.) Lozoya signed the plea rejection form four days earlier, on July 29, 2010. (Doc. 15-1, Ex. 6.)

Thus, it is not apparent that either Crooks or Munoz were aware of the alleged extortion[10] on July 29, 2010, and neither could have told Lozoya about it before he decided to reject the offer. Further, the record refutes Lozoya's assertion that the plea offer was available up until the day of trial. The rejection of the plea agreement that Lozoya signed on July 29, 2010, states, "I understand that this offer will be withdrawn, that no further offers for a plea bargain may be made, and that this case will proceed to trial." (Doc. 15-1, Ex. 6.)

Lozoya does not show that his defaulted ineffective assistance of trial counsel claim was substantial under *Martinez*. Nor does he show that postconviction counsel knew of this potential claim. Accordingly, Lozoya does not show that his postconviction counsel was ineffective for failing to raise the defaulted ineffective assistance of trial counsel claim in state court. As Lozoya has not established cause under *Martinez* to excuse the procedural default, this claim is barred from federal habeas review. Ground One does not warrant federal habeas relief.[11]

---

[10] Again, although Muniz's testimony references an earlier exchange of money, it appears that she was referring to an earlier instance where she believed the family approached Narvaez with money and items before Narvaez began demanding money from the family.

[11] The gravamen of Lozoya's ineffective assistance of trial counsel claim is that he would have accepted the plea offer if not for trial counsel's alleged deficiency in failing to tell him about the extortion. To the extent

### 3. Ground Two

Lozoya argues that trial counsel was ineffective for failing to tell him that Narvaez had entered a PTI program for his grand theft charge. Lozoya claims that counsel should have informed him that Narvaez was on PTI to "avoid prosecution on those charges, and that as a condition of PTI, Narvaez was to remain crime free, and testify against Lozoya." (Doc. 5, p. 9.) Lozoya asserts that counsel knew "that PTI participants have the incentive to show bias, self-interest, or testify falsely." (*Id.*, p. 10.) Lozoya contends that had he known about Narvaez's participation in this program, he would have accepted the plea offer because he would have realized that Narvaez "would never tell the truth at [Lozoya's] pending trial. Telling the truth at trial meant Narvaez would have had to expose his own criminal activities of fighting, stealing, using and selling drugs." (*Id.*)

Lozoya does not overcome the procedural default under *Martinez* because he fails to show that his defaulted ineffective assistance of trial counsel claim is substantial or that postconviction counsel was ineffective for not raising it. As with Ground One, Lozoya fails to establish that postconviction counsel knew that information about Narvaez's participation in PTI would have affected Lozoya's decision-making process and caused him to accept the plea. While Francisco's affidavit states that Francisco brought the factual basis of this claim to postconviction counsel's attention, that "affidavit" is insufficient to show

---

Lozoya also contends that trial counsel was ineffective for not addressing the extortion during trial, his claim is duplicative of Ground Four, which has been addressed and denied.

that postconviction counsel knew of the claim. Additionally, as addressed above, the record indicates that Lozoya had no intention of agreeing to go to prison for five-and-a-half years when the offer was made, and he rejected the plea offer despite knowing that that State was ready to proceed to trial.

Furthermore, this Court makes note of the State's written closing argument filed after the postconviction evidentiary hearing. Although the State appears to agree that Narvaez was on PTI at the time of Lozoya's trial, the State indicated that Narvaez entered the PTI program on February 26, 2009, before the offenses occurred on August 7, 2009, and that "the PTI contract Mr. Narvaez entered into did not have any terms or conditions relating to truthful testimony or cooperation" in Lozoya's case. (Doc. 15-2, Ex. 19, pp. 110-12.) The State also asserted that Narvaez "did not have any open or active cases pending with the Office of the State Attorney" at the time of Lozoya's trial. (*Id.*, p. 110.)

Lozoya does not refute the State's representations about Narvaez's state court case; in particular, he offers no evidence that the terms of Narvaez's PTI required his cooperation in Lozoya's case.[12] Therefore, it is not apparent Narvaez was motivated to testify in a certain way to assure compliance with his PTI terms as Lozoya asserts. Additionally, Lozoya's claim that counsel knew PTI participants are more likely to testify in a certain way to win

---

[12] Consistent with the State's assertions, as addressed, Munoz testified at the evidentiary hearing that she was aware Narvaez entered the PTI program several months before she was retained and that she had no reason to believe the State offered participation in the PTI program to Narvaez in exchange for his testimony. (Doc. 15-10, Ex. 34, Vol. 2, pp. 69-70.)

the State's approval is unfounded and conclusory. Thus, Lozoya's claims are too speculative to demonstrate entitlement to relief. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

Lozoya does not show that his claim alleging ineffective assistance of trial counsel for not advising Lozoya that Narvaez was on PTI is substantial. He does not establish that postconviction counsel was ineffective under *Strickland* for not raising this insubstantial claim. Therefore, Lozoya does not establish cause to excuse the default of his ineffective assistance of trial counsel claim under *Martinez* and that claim is barred from federal habeas review. Ground Two does not entitle Lozoya to federal habeas relief.

### 4. Ground Three

Lozoya argues that trial counsel was ineffective for failing to advise him that co-defendant Miguel Quijada made a plea deal with the State under which Quijada received "leniency" in exchange for testifying at trial. (Doc. 5, p. 11.) Lozoya claims that the State gave Quijada use and derivative use immunity, and assured Quijada no further charges would be filed against him. (*Id.*) Lozoya states that Quijada pleaded guilty on June 3, 2010, but that his sentencing was "postponed" until after Lozoya's trial. (*Id.*, p. 12.)

Lozoya claims that this omission "cause[d] him to reject his own plea offer from the State for 5 ½ years, believing that Quijada would testify in a completely different manner

at trial." (*Id.*) Lozoya claims that he "was counting on Quijada to testify truthfully, that Narvaez had been dragged into the Hummer after he requested to be taken to see Mateo Hernandez. Had this truth been presented to the jury, Lozoya would not have been convicted of kidnapping Narvaez." (*Id.*, p. 13.) He also contends that Quijada failed to mention in his testimony that "it was actually Lozoya who stopped him and Muniz from beating Narvaez" and that Narvaez "wanted to be taken to Mateo Hernandez to prove he didn't steal his drugs." (*Id.*, p. 12.)

Lozoya does not establish that his postconviction counsel was ineffective for not raising this ineffective assistance of trial counsel claim. As Lozoya appears to recognize in his petition, and as the record shows, Quijada entered an open plea. (*Id.*, p. 11.) Lozoya fails to come forward with any evidence showing a deal with the State whereby Quijada would receive leniency for his testimony.

Quijada testified at trial that no deal existed regarding his sentence and stated that he was guilty. Quijada testified on direct examination:

Q    On June third of this year did you plead guilty to charges in this case?

A    Yes, sir.

Q    Have you been sentenced yet?

A    No, sir.

Q      Has there been any agreement whatsoever regarding what sentence you are going to receive?

A      No, sir.

Q      At any time have you or your lawyer gotten a promise or guarantee from me or my office about a sentence?

A      No, sir.

Q      Has there been any offer or promise in exchange for your testimony today?

A      No, sir.

(Doc. 15-8, Ex. 32, p. 158.)

Quijada testified on cross-examination:

Q      And I believe the prosecutor asked you, you pled guilty on this. You have not been sentenced and you indicated that you have not received any promises as to what your sentence might be?

A      No, sir.

Q      Okay. You obviously have some expectations though don't you or hopes?

A       I mean, I don't know what I'm going to get. Some time, you know, because I'm guilty of what I done. I know that I did a crime. I don't expect to get off like, just like that, you know?

Q       Well, you have not signed anything or nobody has signed anything saying well, look, we're only going to do this much, have they?

A       No, sir.

Q       But have you not had some explanations of what they believe probably will happen to you?

A       No, sir.

Q       Nobody has said anything?

A       Nobody has said anything to me or promised me anything.

Q       So then what possessed you then to just plead guilty?

A       Excuse me?

Q       Why did you plead guilty?

A       Because I'm pretty much guilty of the crime.

(*Id.*, pp. 172-73.)

Lozoya also claims that the use and derivative use immunity given to Quijada motivated him to testify in the State's favor. A proffer of Quijada's testimony taken after he pleaded guilty shows that the prosecutor told Quijada he was granted use and derivate use immunity. (Doc. 15-6, Ex. 29, Attachment M, p. 5.) In explaining that immunity, the prosecutor told Quijada that he suspected this matter was drug-related and that if Quijada disclosed information about illegal activity, such information would not be used against him and would not be used to bring additional charges. (*Id.*, pp. 5-6.)

Use and derivative use immunity are granted to any witness compelled by subpoena. *See* § 914.04, Fla. Stat. (stating that a person under subpoena is not excused from testifying or producing evidence because the testimony or evidence "may tend to convict him or her of a crime . . . but no testimony so given or evidence so produced shall be received against the person upon any criminal investigation or proceeding"). Thus, Lozoya does not establish that granting such immunity was part of a plea deal to give Quijada leniency for his testimony in Lozoya's trial.

Lozoya has not established that Quijada had any deal to receive "leniency" by testifying against him. As he does not establish that there was any such deal about which counsel could have informed him, Lozoya does not show that his defaulted ineffective assistance of trial counsel claim is substantial under *Martinez*. Nor does he show that postconviction counsel was ineffective for not raising this claim of ineffective assistance of

trial counsel. Lozoya does not overcome the default of Ground Three under *Martinez*. Accordingly, it is barred from review and affords no federal habeas relief.[13]

## V.   CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Lozoya must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Lozoya has not made the requisite showing. Finally, because Lozoya is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Lozoya's amended Petition for Writ of Habeas Corpus (Doc. 5) is **DENIED**. The **CLERK** is directed to enter judgment against Lozoya and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on March 25, 2022.

---

[13] Lozoya seeks an evidentiary hearing on his claims. The Court determines that an evidentiary hearing is not warranted. *See Schriro*, 550 U.S. 465, 474 (2007) (stating that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing").

Kathryn Kimball Mizelle
United States District Judge